## ARTHUR POWELL v. STATE.

No. A-2159.    Opinion Filed July 17, 1915.

1. RAPE—Sufficiency of Evidence. In a prosecution for statutory rape where there is testimony from which the jury might legally have inferred all the essential elements of the crime charged, and it does not appear that the jury were influenced by considerations other than the evidence, the verdict of guilty will not be disturbed.

2. TRIAL—Consideration of Evidence—Province of Jury. The credibility of the defendant and other witnesses testifying in his behalf is the exclusive province of the jury to determine, and although such testimony be uncontradicted and not directly impeached, when there are facts and circumstances in evidence tending to lessen the probability that such testimony is true, the jury may give it such weight as they deem proper, even to the extent of wholly disregarding the same.

3. RAPE—Question of Marriage—Evidence—Jury. In a prosecution for statutory rape, it is not necessary to prove by direct and positive evidence that the defendant and the prosecutrix were not husband and wife at the time of the alleged offense, but it is sufficient if there are facts and circumstances in evidence that will justify the jury in reaching that conclusion.

4. TRIAL—Instructions. Instructions, both given and refused, are examined, though not set out in the opinion, and no reversible error is found in them.

(Syllabus by the Court.)

*Appeal from District Court, Okmulgee County;*
*Wade S. Stanfield, Judge.*

Arthur Powell, convicted of rape, appeals.    Affirmed.

*Eaton & Cowley,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, P. J.　Plaintiff in error was tried and convicted in the district court of Okmulgee county on an information charging the crime of rape upon the person of Katie Hendry, a female under the age of fourteen years, to wit, of the age of ten years.　The jury by their verdict assessed the term of his imprisonment in the penitentiary at 30 years.　On the 8th day of July, 1913, judgment was rendered and sentence imposed in pursuance of the verdict.　From this judgment an appeal was taken by filing in this court on December 23, 1913, a petition in error with case-made.

The evidence shows that on Sunday morning, July 14, 1912, Katie Hendry, a child ten years old, the daughter of James Hendry, a coal miner living in the town of Henryetta, was the victim of an assault accompanied by rape.　On that day between the hours of 8 and 9 o'clock a. m. she was sent by her mother to get meat at a meat market on Main street in Henryetta, and was returning home when a man, afterwards identified by her as the plaintiff in error, approached her near the Bryant livery barn.　Katie Hendry testified that he told her there was a picnic on the hill for all the school girls and that he would give her two little white rabbits if she would go with him.　That she went with him and they crossed the Frisco and M. O. & G. railroad tracks and a fence and then went through two corn fields near a little creek and crossed another fence and went to the top of the hill and there they stopped under a shady tree. She further testified that this man then told her to lie down and she refused to; that he then took out of his pocket a little knife with an ivory handle and opened it and told her if she didn't lay down he would cut her throat; that she laid down and he tore her person with his fingers and he then got down on top of her and while he was thus on her she felt his person in her person.　After that they went down to the creek; there he told her to take off her underskirt and wash it in the

creek; and he would wait in the shade; that after she had washed her skirt she looked for him but could not find him and she went home and told her father about what the man had done. The evidence further shows that her father took her to her grandmother's where her mother was; from there her parents took her in a buggy to the office of Dr. Breese. At Dr. Breese's office she told those present that the man wore a light white shirt, blue pants, black button shoes and a little turned up hat and a reddish tie. It was then about 11 a. m. After she was examined in the doctor's office her father took her down on the street and put her in a buggy and told her to look into every man's face and see if she could find that man. In a few minutes Arthur Powell appeared and she pointed him out as the man who had assaulted her.

James Hendry testified that his daughter returned home about 10:30 a. m. After the doctor had treated her they carried her down the stairs and lifted her into the buggy; and after sitting there about five minutes she pointed out the plaintiff in error and said, "Papa, that is the man," that he grabbed Powell and told him to show his knife. That Powell produced a small pen knife with an ivory handle.

Mr. and Mrs. Hendry both testified that their daughter Katie was eleven years old on the 23rd day of September, 1912. Dr. Breese, Dr. Robinson, and Dr. Holmes testified that their examination of the child disclosed a downward laceration at the entrance of the vagina of about one and a half inches, and a laceration extending into the vagina about two and one-half inches; that Powell was brought into Dr. Breese's office immediately after his identification by the little girl and an examination of his person and clothing was made; that the examination of the private parts disclosed no indication of his having committed the crime, and an examination of his finger nails with a microscope failed to disclose any blood, but they did find two or three spots of blood on the front and lower part of his shirt, which did not appear to be fresh.

Mollie Pinkston, Will Frayer, and Jim Reed testified to seeing a man coming out of a corn field west and south of the place of the assault, dressed in clothes corresponding to the clothes worn by the plaintiff in error on that day. The last two witnesses identified the plaintiff in error as the man they saw coming out of the corn field.

Ben Sheppard testified that he saw a man dressed in clothes corresponding to those worn by the plaintiff in error that day in company with a little girl in a field through which the little girl claimed to have traveled; that afterwards in company with the officers he followed the tracks made by the man and a little girl about one-half a mile.

S. F. Roach, John Montgomery, and A. Y. Patty testified to having examined the tracks along the route over which it was claimed that these parties traveled in going to the place of the assault and taking the shoes of plaintiff in error and fitting them in a number of said tracks.

The foregoing comprises in substance the testimony introduced by the state.

The plaintiff in error became a witness in his own behalf, and testified that he was about 30 years of age, that he arrived in Henryetta the night of July 13th, stayed all night at the King Hotel; that he arose about 5 o'clock in the morning and went from there to a restaurant on Main street where he ate breakfast and from there he went across the street to the Red Cross drug store where he bought some cold drinks and then returned to this restaurant, and from there he went east to a quick lunch stand and from there over to Dr. Mooney's residence and talked with Mrs. Mooney. From there he returned back to the lunch stand and from there he went to the King Hotel and paid for his lodging, and from there he went to Mrs. Six's restaurant, and from there he returned back to Main street and went to the hotel just across the street from the Bryant livery barn; that at this hotel he awoke the cook, a man with whom he had some acquaintance; that from this hotel he crossed the street over to the Bryant livery barn and talked with witness Moncreith about securing employment; that

he then started to cross Main street to the Hooper hide house and on the way he met A. W. Hooper, and returned with Hooper back to the hotel; that from there he went to the hide house and talked with A. W. Hooper's brother, and then went second time to the residence of Dr. Mooney and talked with Dr. Mooney's wife; that he then went to the Red Cross drug store and purchased some cold drinks; from there he was not certain as to whether he went to the plumber's shop or to the residence of Rube Beal; that he was at each of these places after he left the Red Cross drug store the second time; at the residence of Rube Beal he talked with Mrs. Beal a short time and then returned back to Main street; he met the witness Pharris near the post office and had a conversation with him, lasting some fifteen or twenty minutes; after leaving the witness Pharris he proceeded to the Henryetta Hotel and there met the cook whom he had seen in the early part of the morning. From this point he went back on Main street and up Main street to where he saw a crowd gathering in front of the Red Cross drug store; that his attention was attracted to the crowd and because of the fact that he held certain coupons given to him at the Red Cross drug store on account of certain purchases which he had made there, as he understood certain prizes were to be distributed to parties holding certain coupons on that day, he mingled with the crowd and met Rube Beal and was in the act of shaking hands with him when Jim Hendry, the father of the girl, took him by the arm and he was immediately arrested and taken to the office of Dr. Breese where he was examined by several doctors with a view of ascertaining whether or not there was any evidence pointing to his guilt.

On corroboration of his testimony he called as a witness Pete Balboa who testified he saw the plaintiff in error on that day behind the King Hotel about 7 o'clock a. m.; that he saw him the second time between 9 and 9:30 a. m., going to the hotel immediately across the street from the Bryant livery barn.

A. W. Hooper testified that he saw the plaintiff in error near the hide house and went with him to the hotel just across

Main street from the Bryant livery barn; that it was then between 9 and 10 o'clock a. m.

D. C. (Jack) Moncreith testified that he saw the plaintiff in error on the morning of the 14th of July between 9 and 9:30 o'clock and had a conversation with him at the Bryant livery barn.

Mrs. Dr. Mooney testified that on the morning of July 14th, the plaintiff in error came to her house and inquired for her husband, Dr. Mooney, twice. The first time he came there it was about the hour of 8 o'clock, and that the second time he came back he inquired of witness as to the time of day and that she looked at the clock and that it was 10:20 by the clock.

Walter Broom testified that he was in the Red Cross drug store that morning and that the plaintiff in error, in company with a man by the name of Davidson, came into said drug store about 10 o'clock.

George Steinhouse testified that he was in the Red Cross drug store that morning about 10 o'clock, that a few minutes after he entered the store the plaintiff in error came in, that Davey Davidson from Dewar was with him.

Mrs. M. I. Kusselman testified that she lived just across the street from Rube Beal's, and was at the home of Rube Beal between 10 and 11 o'clock on the morning of July 14th and that the plaintiff in error came while she was there and talked to Mrs. Beal in regard to the whereabouts of Mr. Beal.

Pleasant A. Pharris testified that about the hour of 11 o'clock a. m. or a little after he saw the plaintiff in error in front of the postoffice and had a conversation with him.

Dr. W. C. Sanderson testified that in his opinion as a physician and surgeon, the blood upon the shirt of plaintiff in error had been on there from twelve to twenty-four hours; that the person of the plaintiff in error was at the time of these examinations, in a perfect normal condition; that there were no abrasions about the organ to show that he had committed the crime that he was accused of.

The foregoing comprises in substance the testimony introduced on behalf of the defendant.

The principal assignments of error question the sufficiency of the evidence to support the verdict of the jury. It is strenuously insisted, in the very able brief of counsel, that the evidence of the identity of the defendant is at once improbable, and insufficient in that the testimony of the defendant and the witnesses testifying in his behalf in support of the alibi is uncontradicted and unimpeached. The defense of an alibi depends so much upon the attending circumstances, which can be under the view of the trial judge only, that this court will not reverse the findings of the jury or the order of the trial judge, even in a case where the conviction rests upon circumstantial evidence, except the error be plain. In rape cases the defense of an alibi and mistaken identity has often been urged and apparently been complete so far as the evidence is concerned, and yet been disbelieved by jurors.

*Ingram v. State,* 3 Okla. Cr. 634, 108 Pac. 552. In this case it was said:

"Under our system of jurisprudence, it is the exclusive province of the jury to determine whether the evidence tending to prove the guilt of the defendant is so lacking in convincing force as to leave an intelligent and discriminating mind to doubt as to the truth of the charge contained in the indictment, and in reviewing questions of fact upon appeal to the Criminal Court of Appeals, if there is a fair conflict in the evidence, or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion or prejudice."

It is also contended that the evidence is insufficient in that there was no evidence to show "that the said Katie Hendry was not the wife of said defendant Arthur Powell." Counsel admit that the contention is technical, and in their brief say: "It is true there is testimony in the record tending to show circumstances from which it might be inferred that Katie Hendry was not at the time of the commission of this crime, the wife of the plaintiff in error, her alleged assailant.

The circumstances from which this inference might be drawn were to the effect that Katie Hendry, the injured party, was

at this time living with her parents in Henryetta; that she was 11 years of age and had never seen the plaintiff in error prior to the day upon which this crime was committed; that her name was different from that of the plaintiff in error. The plaintiff in error also testified that he had never seen Katie Hendry, the injured party, as he remembered of, prior to the time he was identified by her in the crowd on Main street in the city of Henryetta, immediately preceding his arrest. This in substance comprises all the testimony, in our opinion necessary to refer to, to establish facts upon which a conclusion might be drawn that Katie Hendry was not at the time of the commission of this offense, the wife of the plaintiff in error, her alleged assailant.

It is true there is no direct and positive evidence that the child was not the wife of the defendant, but the testimony shows that she was under the age of eleven years at the time of the assault and that she was a mere school girl living with her parents. This court knows judicially that a girl of that age could not marry under the laws of this state and all the facts and circumstances in evidence show beyond any question that she was not the wife of the defendant.

In *Brenton v. Territory*, 15 Okla. 6, 78 Pac. 83, 6 Ann. Cas. 769, it was held that in a prosecution for statutory rape, it is not necessary to prove by direct and positive evidence that the defendant and the prosecutrix were not husband and wife at the time of the alleged offense, but it is sufficient if there are facts and circumstances in evidence that would justify the jury in reaching that conclusion.

See, also, *State v. May*, 59 Wash. 414, 109 Pac. 1026, 23 Ann. Cases, 113.

It is also argued that the evidence is insufficient to show that there was any sexual penetration.

Our penal code (section 2416, Rev. Laws 1910) prescribes that:

"The essential guilt of rape, except with the consent of a female over fourteen years of age, consists in the outrage to the

person and feelings of the female. Any sexual penetration, however slight, is sufficient to complete the crime."

Counsel in their brief quote certain parts of the testimony of Katie Hendry and argue therefrom that sexual penetration was not shown. We think her testimony alone sufficient to show sexual penetration. She stated that after he compelled her to lie down he got on top of her. The county attorney then asked this question:

"Q. When he got on top of you did you feel his person in your person anywhere? A. Yes, sir."

The county attorney did not pursue the inquiry further, nor do we find that the defendant's counsel interrogated her in any manner as to this matter. From her answer to such question coupled with her testimony as to the other acts of the plaintiff in error, and his declarations as to his purpose, the evidence was such as to satisfy the minds of the jurors that the crime of rape had been committed. There ought to be, as usually there is, some delicacy in examining a child of tender years as to such a henious offense.

In *State v. Hodges,* 61 N. C. 236, the court said:

"The law did not require that she should use any particular form of words in stating that the prisoner had penetrated her body. Words are but the signs of ideas, and it is well known that the same idea may be communicated to a hearer in a variety of forms of expression."

In *State v. Depoister,* 21 Nev. 107, the court said:

"Section 4244, Gen. Stat. reads: 'Proof of actual penetration into the body is sufficient to sustain an indictment for rape.' Under this statute we shall hold the slightest proof of the commission of the offense will justify the judge in submitting the question of fact to the jury, and no form of words are necessary to prove the commisison of the crime. The proof, therefore, can be inferred from circumstances, apart from the statements of the party injured. The prosecuting witness testified as to the position occupied by the defendant at the time of the commission of the offense, and it was such as to satisfy the minds of the jurors that the crime of rape had been committed, and the physician by whom she was examined found injuries upon her person which such an act might have occasioned. (*Brauer v.*

*State,* 25 Wis. 415; *People v. Crowley,* 102 N. Y. 237; *Taylor v. State,* 111 Ind. 280; *State v. Tarr,* 28 Iowa, 397; Bishop Stat. Crimes, sec. 488.)

"If the doctrines contended for by counsel for appellant should prevail, then the scoundrel who attempted the chastity of a child or a young girl would escape punishment merely because of her youth, preventing his fully consummating the crime, which appears to us, as undesirable as it would be unjust."

Several assignments are based on the action of the court in refusing to give instructions requested by counsel for the defendant, and on exceptions taken to instructions given by the court.

With a full appreciation of the importance of this case to the defendant we have examined all the instructions, including those given and refused, and we find no error. The instructions refused were sufficiently included in those given by the court. A case seldom appears in the annals of criminal law where a lecherous degenerate has been guilty of such bestial conduct in an attempt to gratify his lust as is shown by the record in this case. It is almost beyond belief that in a civilized country such a crime could be committed. That the crime was committed by some one is not questioned. The question of the identity of the defendant as the perpetrator was the only disputed question before the jury. Upon a careful review of the testimony, we see no sufficient reason to distrust the conclusion which the jury reached, and finding no reversible error in the the record, it follows that the judgment of the court below must be affirmed.

FURMAN and ARMSTRONG, JJ., concur.