OSCAR GRAHAM v. STATE.

No. A-10373.   April 4, 1945.
(157 P. 2d 758.)

160

Jerome Sullivan, of Duncan, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Oscar Graham, was charged in the district court of Stephens county with the crime of murder; was tried, convicted of manslaughter in the second degree, and sentenced to serve one year in the county jail, and has appealed.

This is the second appeal by the defendant from a conviction in this case.   In the former appeal, the case was reversed because of error of the trial court in communicating with the jury out of the presence of defendant and his counsel, after the jurors had retired to their jury-room.   Graham v. State, 73 Okla. Cr. 337, 121 P. 2d 308. In said former appeal, the defendant had been convicted of manslaughter in the first degree and sentenced to serve 11 years in the State Penitentiary.

For a reversal of this case, the following propositions are presented: (1) The evidence is insufficient to sustain the verdict. (2) Misconduct of the Assistant Attorney General which prevented the defendant from having a fair trial. (3) Error of the court in giving certain instructions to the jury over the objections and exceptions of defendant.

The defendant shot and killed the deceased, Grace McCaulley, in the city of Duncan, at the home of the deceased on July 2, 1939. The defendant, a former constable who had resigned the previous year, had been associating with the deceased for several months. The defendant was married and so was the deceased, but the husband of the deceased was in the State Penitentiary at the time of the shooting.

There is very little dispute in the evidence as to the facts leading up to the actual killing. Defendant had been keeping company with the deceased for about two years prior to her death. On many occasions, they had gone to neighboring towns and stayed overnight. Deceased was engaged in the whisky business. On the afternoon of her death, defendant came to her home about 4 o'clock. He and deceased left in defendant's car. Later, defendant and deceased returned and invited a sister of the deceased to go with them on a drive out into the country. They then left again with the sister of deceased accompanying them and were gone about two hours. During this time, everything was pleasant and agreeable. Some whisky was drunk by all of the parties. When they returned to the McCaulley home, the sister of deceased and deceased went into the house while the defendant drove off to park his automobile. A stranger came up to the porch before defendant returned and asked for some

whisky. Just as the stranger was leaving, the defendant returned and entered the house. Up to that point, there is no apparent conflict in the testimony. The theory of the state was that the defendant returned to the home of the deceased and saw the stranger with the deceased and became jealous. That he ran the stranger away from the place and engaged in a quarrel with the deceased which lead up to the fatal difficulty.

To support this theory, Clyde Williams, brother-in-law of the deceased, testified that he came to the home of the deceased just before the shooting occurred. That as he approached the house, he saw the defendant and another man come around from the back of the McCaulley house. The defendant was saying to the other man, "Hop, and I mean hop." That the car of the stranger, to whom the defendant was talking, was parked across the street from the McCaulley house. Williams and his wife Lottie, who was a sister of the deceased, testified that they were standing in the southeast bedroom and heard loud talking and scuffling in the kitchen between the defendant and Grace McCaulley. That they seemed to be angry. That in a short space of time, defendant came out of the kitchen into the room where they were standing and said that Grace had stabbed him with an ice pick. There was some blood appearing through the shirt of defendant. That the deceased followed the defendant out of the kitchen and, upon hearing the defendant say that she had stabbed him, said, "Yes, and I'll stab you again." To which the defendant said, "If you do, I'll kill you." That the deceased had an ice pick in her hand. That she and the defendant went together and the defendant shoved her back momentarily, took a gun out of his right front pocket, and shot her. The shot struck deceased in the

neck and ranged downward. She was taken to the hospital, where she died the following night.

The defendant interposed a plea of self-defense, and also, that the killing was a result of accident and misfortune.

As to the facts immediately surrounding the killing, the defendant testified that when he returned to Grace McCaulley's house after parking his automobile, he saw a car parked across the street from the McCaulley house. That he and deceased went in the kitchen where he wanted to get a drink of water. That he asked the deceased whose car that was sitting across the street. That deceased did not tell him whose car it was, but accused him of knocking her out of the sale of a pint of whisky. That an argument started and the deceased attempted to get defendant's gun out of his hip pocket. That when she failed in this, she grabbed an ice pick and jabbed him four times on the arm with it. That he went into the southeast bedroom and was talking to Lottie and Clyde Williams when the deceased came in with the ice pick in her hand and rushed at him with it. That he had the pistol in his right front pocket with his hand on it. That when the deceased rushed at him with the ice pick, he pulled the pistol out of his pocket to ward off the blow. He and the deceased commenced to scuffle and during the scuffle the gun accidentally discharged killing the deceased.

We have not attempted to detail a summary of all of the other evidence, but have given only the testimony of the defendant and the other two eyewitnesses to the shooting. This testimony is sufficient to show that there is a dispute between the evidence of the state and the testimony of the defendant concerning the facts surrounding

the actual commission of the homicide. If the jury had chosen to have believed the story of the defendant, they would have found him not guilty. Under the testimony of the state, as related by Clyde and Lottie Williams, the defendant could have been convicted of murder. The verdict as rendered was evidence of a compromise verdict. One year in the county jail was too lenient a punishment if the defendant was guilty, and, of course, if he was not guilty of a crime, he should not have been punished at all. However, the jury has fixed the punishment and the only question with which this court is concerned is whether there is any substantial evidence in the record to sustain the verdict. This question of law must be answered in the affirmative.

It is next contended that the Attorney General was guilty of misconduct which prevented the defendant from having a fair trial. In connection with this assignment of error, it is argued that the Attorney General made improper remarks in his closing argument to the jury. We have examined the record carefully in connection with this assignment of error. The argument of the Assistant Attorney General was not taken by the court reporter and there is no reference to the argument of the prosecutor until it appears in the motion for new trial filed by counsel for defendant. Counsel for the state do not admit that the argument as set forth in the petition in error was made by the Assistant Attorney General.

It is well-settled that counsel for defendant must object to the alleged improper statements by the prosecutor at the time they are made and move the court to exclude such remarks from the consideration of the jury, and make a proper record so that this court may determine from an examination of the record whether the alleged

improper remarks were actually made, and, if so, whether they were invited or provoked by opposing counsel's remarks. Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817; Kennamer v. State, 59 Okla. Cr. 146, 57 P. 2d 646; Peters v. State, 71 Okla. Cr. 175, 110 P. 2d 300.

In the case of Rainey v. State, 71 Okla. Cr. 1, 107 P. 2d 371, 372, it is stated:

"Where there is no proper record in the case-made of an alleged improper remark of the prosecuting attorney to the jury, this court will not consider the same."

In connection with the same assignment of error, it is contended that the Assistant Attorney General was guilty of improper conduct in the cross-examination of the defendant. Some of the questions asked by the prosecutor, and to which this proposition is directed, were argumentative, some were wholly irrelevant to the issue, but the question asked defendant concerning the conviction of the defendant on a charge arising out of an offense where the defendant was allegedly caught in immoral conduct with a woman was probably proper.

On cross-examination of a witness for the purpose of affecting his credibility, he may be asked if he has ever been convicted of a felony or of any offense which involves moral turpitude. Pryor v. State, 51 Okla. Cr. 345, 1 P. 2d 797.

The record discloses that as to all of the conduct complained of in each instance where an objection was interposed by counsel for the defendant, the trial court sustained the objection, and in connection with the question concerning the alleged conviction of the morals charge, the court instructed the jury that the question was improper and for them not to consider it for any purpose

whatsoever. This was an error committed by the trial court in defendant's favor, as the state had a right to ask of the defendant concerning any conviction he might have sustained on any offense involving moral turpitude. It appears throughout the record that in practically every instance where an issue concerning the admissibility of evidence arose, the court gave the benefit of any doubt to defendant. An example of this is best illustrated in the cross-examination by counsel for defendant of the witness Lottie Williams. The court allowed counsel for defendant to inquire concerning the conviction of a man with whom the witness had allegedly committed an immoral act. In furtherance of this contention of defendant that such evidence was admissible, the court allowed the information and judgment and sentence of the man to be read in evidence. There was no charge filed against the witness Lottie Williams, but counsel for defendant insisted that this evidence was admissible for the purpose of affecting her credibility because of her association with the convicted man.

After making such a contention in connection with their cross-examination of the witness Lottie Williams, counsel for defendant are not in very good position to complain of the cross-examination of defendant.

The trial court gave a lengthy set of instructions. Several of those given were evidently requested by defendant in support of his theory of the case. Defendant contends that three of the instructions which were given were improper. These instructions are as follows:

"You are further instructed, gentlemen, that if a person arms himself with a deadly weapon and voluntarily and unnecessarily enters into a mutual combat for the purpose of getting a pretext to slay his adversary, or if

such person has reason to believe that such combat will, or may, result in death or serious bodily harm to one or the other of the persons engaged therein, then the right of self-defense will not arise in favor of such person, no matter to what extremity he may be reduced during the combat, unless before the fatal blow was struck or the fatal shot fired, he in good faith withdraws or attempts to withdraw from the conflict, and either by word or act makes the fact of his intention to withdraw known to his antagonist, and the latter thereafter, continues to press him and gives him reasonable cause to believe that he is in danger of being killed or receiving great bodily injury at the hands of his assailant."

"You are further instructed that with respect to the statements which have been admitted herein, as the dying declarations of the decreased, Grace McCaulley, (if you find that such statements were so made by her), you are told that unless you find that they were made under the conviction of impending death, on the part of said deceased, then you are to entirely disregard such statements and give them no weight whatsoever. If you find that they were made under the conditions aforesaid, you are not bound to believe such statements to be true, but you should consider them like any other evidence in the case, giving them such weight as you deem them entitled to have in the light of their surrounding circumstances and all the other facts and circumstances in the case."

"You are instructed, gentlemen, that some evidence has been offered on the part of the state seeking to show the defendant attempted to flee and evade arrest immediately after the commission of the offense. In this connection, gentlemen, you are instructed that flight is regarded as some evidence of guilt, but in this case, it is for you to determine whether or not the defendant made an attempt to flee or evade arrest and unless you find, beyond a reasonable doubt, that he did flee for the purpose of evading arrest, you should entirely disregard this evidence, but on the other hand, should you find, beyond a reasonable doubt, that he did attempt to flee for the pur-

pose aforesaid, you may then consider it in determining the guilt or innocence of the defendant."

It is conceded that the first instruction is correct as an abstract proposition of law, but it is contended that it is not applicable to the evidence in the case. This instruction could very well have been omitted, but, when considered in connection with the four instructions just preceding it, it clarifies all of the law relative to self-defense. The jury came to the conclusion that the killing of the deceased was the result of the culpable negligence of the accused, as they only convicted him of manslaughter in the second degree with a penalty of one year in the county jail.

As to the second instruction, counsel have cited no authority to sustain their contention that it was error to submit the competency of the dying declaration to the jury. Counsel for the state, in their answer brief, also, do not submit any authority to sustain this instruction. In fact, they omit any discussion of this question in their brief.

It has been held that it is the duty of the trial court to determine in the first instance the admissibility of statements offered in evidence as a dying declaration, and if such declaration is admitted as competent and made while the declarant was in extremis, it is then a question for the jury to pass on its credibility. Bilton v. Territory, 1 Okla. Cr. 566, 99 P. 163; Morehead v. State, 12 Okla. Cr. 62, 151 P. 1183, Ann. Cas. 1918C, 416.

In Looper v. State, 42 Okla. Cr. 341, 276 P. 503, it is stated:

"It is the province of the court to determine, in the first instance, the admissibility of declarations offered in

evidence as dying declarations, and, for the purpose of proving the declarant's sense of impending death, expressions or statements of the deceased are always admissible, if made at or about the time the dying declarations were made; and in this case it was the duty of the court to hear the evidence offered by the defendant, before determining that the dying declarations were competent and admissible.

"Where, in the trial of a criminal case, the court as a matter of law passes upon the competency of dying declarations and finds that they are competent to be submitted to the jury, and they are submitted to the jury, it is not error for the court by an instruction, to again submit the question to the competency of such declarations to the jury for their consideration."

See, also, to the same effect, Beason v. State, 18 Okla. Cr. 388, 195 P. 792; and Willoughby v. Territory, 16 Okla. 577, 87 P. 56, 8 Ann. Cas. 537.

As to the third instruction above quoted, it is not contended that the instruction is incorrect as to form, but it is contended that there was no evidence showing flight on the part of defendant.

The testimony of the officers was that they followed defendant out into the country to the home of a brother. That when they arrived there, defendant's car lights were on and the door to his car was left open. They searched but could not find defendant.

Defendant himself testified that he went to his brother's home about 14 miles west of Duncan immediately after the shooting. That he left the lights of his car on. That while talking to his brother, he saw the lights of the car of the officers approaching and that he walked across the pasture to another man's house and got him to bring him to town. That he was not trying to flee

the jurisdiction of the court, but was trying to find someone to make his bond.

Two ladies, who were at the Graham home, testified that defendant drove up into the yard of his home, called his wife to the car, and then drove off west at a high rate of speed.

The state contended that defendant was attempting to flee and infer that he would have left the county except for the restraining influence of his brother and family. The evidence as to flight was not strong, but a reading of the above instruction will show that the court clearly advised the jury to disregard the evidence of the attempted flight unless they found, beyond a reasonable doubt, that defendant had attempted to flee and evade arrest immediately after the commission of the offense. It appears that the instruction as given was not injurious to the defendant and under all of the facts and circumstances was a proper and necessary instruction.

As stated in the beginning, this is the second occasion that we have had to review the record growing out of this tragedy. In any case as hard-fought as this. there may be found a few instances where errors might have been made in the conduct of the trial, but on the whole, a reading of this record emphasizes the fairness which characterized the rulings of the trial judge. There is certainly nothing in the record which would justify this court in concluding that the defendant had been deprived of any substantial right or that there were errors of such consequence as deprived him from having that fair trial guaranteed by our laws.

The judgment of the district court of Stephens county is affirmed.

BAREFOOT, P. J., concurs.  DOYLE, J., not participating.